UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL NO. 04-CR-10342-NG |
| ) | |
| ) | |
| GARY ADAMS ) | |
| ) | |
| Defendant ) | |

**United States' Opposition to Defendant Gary Adams'
Motion to Suppress Evidence**

The United States respectfully urges the Court to deny the defendant's motion to suppress and submits this response in support of its position.

**Background**

The United States anticipates that testimony and evidence presented at the suppression hearing will reveal the following:  At about 7:47 p.m. on August 13, 2004, Boston Police Officers Douglas McGrath and Michael Paillant were dispatched to the area of Corbet and Hopkins streets relating to a complaint about a group of men allegedly dealing drugs. The men were described as wearing white t-shirts and baseball caps on backwards. When they arrived, the officers observed a group of about eight or nine men, several of whom met this description. The officers contacted dispatch for additional officers to respond.  Officers Paillant and McGrath approached the group of men, displaying their badges and identifying themselves as Boston police officers. Officer Paillant told one of the men–later identified as the defendant Gary Adams–to put down his open beer bottle, which he did. Within a few minutes other police officers had arrived on the scene.

Some of the officers questioned the men and pat frisked them, due to recent shootings in

the area. Officer McGrath talked to and frisked Adams, who identified himself to Officer McGrath. Two cars were parked near where the men were standing. Officer Paillant looked into one of these cars, a 1991 black Acura Integra, Massachusetts registration number 69EK34, and saw the butt of a firearm protruding from under the driver's seat. He opened the driver's side door briefly, looked under the driver's seat, and then closed the door. Officer Paillant called a couple of other officers over to observe the gun.

Officers asked whose car it was but none of the men responded. After a second request, Adams made a hand gesture acknowledging the car was his. Officer McGrath placed Adams under arrest for public drinking, which is a violation of Boston Municipal Code §16-12.28[1] and advised him of his *Miranda* rights, which Adams said he understood. Meanwhile, another officer ran the license plate on the Acura Integra and determined the car was registered to a Gary Adams, although the date of birth of the car's owner was that of a man significantly older than

---

[1]Section 16-12.28 provides:
**Drinking of Alcoholic Beverages in Public**
   No person shall drink any alcoholic beverage as defined in Chapter 138, Section 1 of the General Laws of the State, or possess an open container, full or partially full, of any alcoholic beverages, while on, in or upon any public way, upon any way to which the public has right of access, in any place to which members of the public have access as invitees or licensees, in any park or playground, conservation area or recreation area, on private land or place without consent of the owner or person in control thereof.

   Massachusetts state law further provides that law enforcement officers may arrest someone in violation of such an ordinance without a warrant. M.G.L. 272 §59. This section states in relevant part that:

   "Whoever is in a street or elsewhere in a town in wilful violation of an ordinance or by-law of such town or by-law of such town....the substance of which is the drinking or possession of alcoholic beverage...may be arrested without a warrant by an officer authorized to serve criminal process in the place where the offence is committed..."

the defendant appeared to be.

Officer Robert Lyden went through the *Miranda* rights with Adams a second time. Adams again said he understood them and agreed to speak with Officer Lyden. Officer Lyden asked the defendant who owned the car. Adams said his father owned it and that he (the defendant) drove it on a regular basis, but not in the last day or so. Officer Lyden asked Adams if his father was a Boston police officer because Officer Lyden had previously worked with an Officer Gary Adams in Brighton. Adams said that he was. Officer Lyden told Adams that if anything illegal was in the car it would be the responsibility of the legal owner and that the owner could be held criminally liable. Officer Lyden asked Adams if he knew what was in the car and Adams said that he did. Officer Lyden asked whether he had a permit for it and Adams said he did not. Adams asked what would happen to his father and Lyden stated that if no one took responsibility for the gun, a patrol supervisor would be called in and the matter would be turned over to the courts. Adams stated, in substance, to "take [him]to jail" and admitted that it was his gun. Adams further stated, not in response to any questioning, that: "The gun is mine, leave my father out of it."

The firearm recovered was a .357 Smith & Wesson revolver, serial number 8K6760. It was loaded with 6 rounds of .357 caliber ammunition, all bearing a headstamp of CBC. On September 15, 2004, ATF Special Agent Philip Ball examined the ammunition and advised that the ammunition was manufactured outside of Massachusetts and therefore, traveled in interstate commerce. Smith & Wesson firearms are manufactured in Springfield, Massachusetts, and, thus far, there is no evidence to establish that this gun has traveled in interstate commerce. The Boston Police Department Firearms Unit tested the firearm and determined that it functioned

normally and rendered an opinion that the ammunition was in fact ammunition.

Prior to August 13, 2004, Adams was convicted of a crime punishable by more than one year of imprisonment. That is, in May 2002, Adams was convicted in Dorchester District Court of assault and battery on a police officer, resisting arrest and escape. In June 1995, ADAMS was convicted in Dorchester District Court of distribution of a Class B controlled substance and in January 1995, Adams was convicted in Dorchester District Court of possession with intent to distribute crack cocaine.

## Discussion

### The Statements

The defendant's statements were made after a voluntary, knowing, and intelligent waiver of his Fifth Amendment rights. The statements were not the product of coercion and are properly admissible against him at trial.

In *Miranda v. Arizona*, 384 U.S. 436 (1966):

> [T]he Court concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against self-incrimination. More specifically, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination."

*Rhode Island v. Innis*, 446 U.S. 291, 297 (1980)(quoting *Miranda*, 384 U.S. at 444). An accused, like Adams, who has been advised of his rights can waive these rights provided that such waiver is "made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444; *see also Colorado v. Connelly*, 479 U.S. 157, 169 (1986) ("Of course, a waiver must at a minimum be 'voluntary' to be effective against an accused."); *United States v. Palmer*, 203 F.3d 55, 60 (1st

Cir. 2000). In making this determination, the Court must look at the totality of the circumstances surrounding the interrogation. *Arizona v. Fulminate,* 499 U.S. 279, 285 (1991); *Palmer*, 203 F.3d at 60. The government may prove a waiver by a preponderance of the evidence. *See Connelly,* 479 U.S. at 168-70; *Palmer*, 203 F.3d at 62. Following recitation of *Miranda* rights, an express statement, either written or oral, that a suspect is willing to make a statement "is usually strong proof of the validity of that waiver..." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

In assessing the validity of the waiver, the courts also consider factors such as the defendant's age, education, and familiarity with the criminal justice system. *United States v. Melanson*, 691 F.2d 579, 588 (1st Cir. 1981)(courts consider age, experience, education, background, intelligence and conduct of defendant); *United States v. Downs-Moses*, 329 F.3d 253, 267 (1st Cir. 2003) (knowing and intelligent waiver found where defendant had IQ of 61); *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000)(knowing and intelligent waiver found where defendant had signed a written waiver and had IQ in mid-70s); *Palmer*, 203 F.3d at 61(valid waiver in part because defendant had 16 prior arrests); *United States v. Garner*, 2001 WL 1835159, *7 (D. Mass. 2001) (valid waiver where defendant had prior convictions involving firearms and violence and no claim that he did not understand rights), *aff'd,* 338 f.3d 78 (1st Cir. 2003).

Whether a statement is voluntarily made requires a determination of "whether the will of the defendant had been overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances." *Bryant v.* Vose, 785 F.2d 364, 367-68 (1st. Cir. 1986)(quoting *Procunier v. Atchley,* 400 U.S. 446, 453 (1971)). The

standard for determining the voluntariness of a confession is the same as that for determining the voluntariness of a *Miranda* waiver. *Connelly*, 479 U.S. at 169-70 ("no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context; "concern...is governmental coercion.")

As noted above, the government anticipates that the officers will testify that the defendant was advised of his *Miranda* rights at least twice at the scene of his arrest, stated he understood those rights, and agreed to talk to the officers. The defendant is 28 years old and has a lengthy adult criminal history dating back to 1993 with numerous arrests and convictions. Indeed, if he is convicted of this felon in possession charge, he is likely subject to a mandatory minimum 15-year sentence under the Armed Career Criminal Act. The defendant does not claim that he was not advised of his rights or that he misunderstood them. Rather, his sole contention is that his statements were involuntary because an officer told him that his father might be held responsible for the firearm and that this information was used to "subvert [the defendant's] free will." [Def. Mem. at 5.] The instant case, however, is on point with a number of cases in which courts have held that statements made because of concern for a loved one were not coerced and thus, not involuntary. *See*, *e.g.*, *United States v. Jackson*, 918 F.2d 236, 242 n.7 (1st Cir. 1990) (defendant's confession voluntary despite being told sister under arrest because sister an adult, defendant did not have particularly close relationship with sister, and defendant not "unusually susceptible to psychological coercion" and had experience with justice system)(citing cases); *United States v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002)(statement voluntary despite alleged threat of legal action against defendant's girlfriend and daughter because defendant was 43 years old and had experience in the criminal justice system).

Similarly here, the defendant is an adult with much experience with the criminal justice system. There is no indication that he was or is particularly susceptible to psychological pressure, if indeed, being truthfully advised of the potential consequences for his father was such pressure. The defendant's will was not overborne and his statements were voluntary.

### The Seizure of the Firearm and Ammunition

The police had probable cause to seize the firearm and ammunition from the defendant's car, as the defendant had admitted, after being properly advised of his *Miranda* rights, that the car and gun were his and that he did not have a permit for the firearm. Thus, there was probable cause to believe that the gun was evidence of a crime, that is, the possession of a firearm without a proper permit or identification card. The officers had seen the firearm in plain view, but had not seized it, until after Adams was placed under arrest and made his admissions.

Law enforcement officers do not need a warrant to search an automobile when they have probable cause to believe it contains contraband or evidence of criminal activity. *United States v. Ross*, 456 U.S. 798, 804-09 (1982). Moreover, following Adams' lawful arrest for public drinking, the officers could properly have searched the passenger compartment of his vehicle incident to his arrest and would have discovered the firearm, even if it had not been in plain view. *Thornton v. United States*, 541 U.S. 615 (2004). In *Thornton*, the Supreme Court held that the rule established in *New York v. Belton*, 453 U.S. 454 (1981), permitting law enforcement to search the passenger compartment of an automobile incident to an occupant's lawful arrest applied even when the officer does not make contact until the person arrested already has left the vehicle. The district court in Maine recently applied the *Thornton* rule to uphold the search of a

vehicle incident to the arrest of an individual who the officer had never seen inside the vehicle. *United States v. Walston*, 2005 WL 757592 (D.Me. Mar. 14, 2005)(magistrate report and recommendation, adopted by district court 2005 WL 767172 (D. Me. April 1, 2005)). In *Walston*, a police officer arrested the defendant at a construction site where he was working. A car was parked about 20 feet from the defendant, which the defendant identified as his wife's car. The magistrate judge concluded that because the defendant came to work in the car and had access to it the entire time he was at work, he had a general "temporal relationship" to it. Additionally, the car's proximity to where the defendant was working , outside as a road flagger, and the likelihood that he was in and out of the car frequently during the day, demonstrated an "extremely close spatial relationship." Both of these relationships justified the search incident to arrest. *Id.* at *3.

Additionally, the search of the car was appropriate as a valid inventory search. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987)("inventory search may be 'reasonable' under the Fourth Amendment even though it is not conducted pursuant to a warrant based upon probable cause); *United State v. Ramos-Morales*, 981 F.2d 625, 626 (1st Cir. 1992)(collecting cases which have concluded that "police may lawfully impound a vehicle that would otherwise remain on the side of a public highway or city street.") In performing the inventory search, the officers also would have discovered the firearm. *United States v. Pardue*, 385 F.3d 101, 105 (1st Cir. 2004) (ammunition seized during inventory search of defendant's backpack following arrest for domestic assault would have been "inevitably discovered.") The defendant's car was properly impounded and towed as a result of the defendant's arrest. The firearm and ammunition would have inevitably been discovered in the standard inventory search of the car. Once discovered,

the officers also could easily determine that the defendant's possession of the gun and ammunition violated either state or federal law or both. The firearm and ammunition were lawfully seized.

## Conclusion

The United States submits that the evidentiary hearing will show that the gun, ammunition, and statements were lawfully obtained and that the defendant's motion to suppress should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Sandra S. Bower
SANDRA BOWER
Assistant U.S. Attorney