UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.    ) | Crim. Docket No. 04-10342-NG |
| ) | |
| GARY J. ADAMS,    ) | |
| Defendant.    ) | |

GERTNER, D.J.

### ORDER RE: DEFENDANT'S MOTION TO SUPPRESS
July 7, 2006

On August 13, 2004, Officer Michael Paillant ("Paillant") received a call at 7:45 p.m. reporting that there were about eight individuals selling drugs on the corner of Corbett and Hopkins Streets in Dorchester, Massachusetts. The description could not have been more generic: "white t-shirts and hats turned backward." (Paillant agreed that that description would cover 75% of the Boston youth population.) Paillant also noted that the description might have included the words "black males." Paillant went to the scene with Officer Douglas McGrath ("McGrath"). The two observed the individuals who, along with numbers of others, met the description, but they saw no drug dealing. Instead, they observed that the individuals were carrying open bottles of alcohol and drinking. The individuals were between a chain link fence (surrounding an abandoned lot) and two parked cars, a BMW and an Acura Integra ("Acura").

The officers parked their unmarked car "in the middle of the street" and identified themselves as police officers. They

approached Gary Adams, the defendant, whom they did not know. They told him to put the beer bottle down, and he did. They asked for his name so they could to do a "field investigation" report, and "pat frisked him for safety." The pat frisk was initiated because the officers reported that there had been several "shootings and/or murders" in the area, although the last incident had been two weeks prior to the Adams arrest.

The officers called for backup to question the men. They did so because the two officers were "outnumbered." In fact, no guns or drugs had been found on any of the individuals. There was no report of shootings tied to this group in general, or to Adams in particular. From outward appearances, nothing was happening other than a group of young men talking and drinking beer on a corner. Other officers arrived and surrounded the men.

The frisk of Adams may well have been problematic,[1] but nothing came of it. Paillant then turned his attention to the BMW and the Acura parked nearby. Neither officer testified that there was any connection between the individuals who were drinking and the cars. No prior "tip" linked the cars with any illegal activity. The Acura was illegally parked.

---

[1] While public drinking is an arrestable offense incident to which the officer could have searched, Adams was frisked before he was arrested. Paillant had no reasonable suspicion that Adams was armed and dangerous. Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Proctor, 148 F.3d 39, 42 (1st Cir. 1998).

Paillant, however, "happened to look inside of [the Acura]" and, "from the outside" he could see several CDs:

> Q. Did you see anything else when you looked in?
> A. From looking through the driver's side window and from the driver's side windshield for the left side, I could see what appeared to be a firearm from the front seat.
> Q. And where was it?
> A. A portion of it was sticking out from the bottom of the front seat.

He made these observations at 7:53 p.m., without a flashlight. (The sun had set at 7:48 p.m.) He notified two other officers of what he had seen. Paillant then asked the individuals on the corner: "Whose car is this?" No one answered. Paillant opened the car door, which was unlocked, got on his hands and knees and looked underneath the seat and saw a revolver and some marijuana. He closed the car door and notified the other officers. Adams was then arrested for "drinking in public."[2] Another individual who had a bottle in his hand was not arrested; Officer Paillant indicated that he did not catch this "other" person in time. In any event, the officers agreed that they were going to "arrest anybody that [they] could find any infraction on."

Paillant's observation that the gun could be seen from outside the car was confirmed by two other officers. Later, patrol supervisor Robert Lyden confirmed the observations, this

---

[2] The testimony is inconsistent as to when Adams was arrested. Officer Paillant indicated that Adams was arrested when he was seen with a beer bottle in his hand some time after Paillant had looked into the car and seen the gun. Officer Lyden, who came on the scene after the initial wave of officers, noted that Adams was arrested after he indicated that the gun in the car was his.

time with a flashlight trained on the inside of the car from outside the window.

Adams was given <u>Miranda</u> warnings after his arrest.  Officer Paillant reported that after he saw the gun, ran the Acura's plates, and "mirandized" Adams, he asked the defendant if his father was a police officer who worked in Brighton.  Adams responded that he was.  Paillant noted that Adams "then made reference to, did we find something inside the vehicle?  And he made a reference to the vehicle belonging to him, but I guess it was registered in the father's name."  Paillant added that Adams "made a reference to -- saying that it was his gun and he didn't want his -- don't get his father involved, involved in this." Adams' father was indeed a police officer.

Adams was put in a cruiser; Officer Lyden after "mirandizing" him again, asked "do you know what's in the car?" Adams said "yes."  And then Lyden asked "do you have a permit for that?"  Adams said "no."  Adams was taken away, and the officers seized the firearm, which was loaded, and nine bags of marijuana.

The defendant has moved to suppress the fruits of the search, a motion which pivots on whether I credit the testimony of the officers (a) about their observations of the gun inside the car, and (b) about Adams' unsolicited remarks to Paillant and solicited remarks to Lyden, acknowledging that the gun was his

and that he had no permit.  I credit the testimony of the officers on both fronts.

I credit Paillant's testimony that he saw a gun sticking out from under the seat of the Acura because it was corroborated by three officers.  While Paillant did not have the authority to open the car door and put his head under the seat to get a better view, his acts in doing so are without legal consequence in this case.³  He closed the door immediately; three other officers confirmed his observations from outside of the car.

I also credit the testimony of Officers Paillant and Lyden that Adams acknowledged that the gun was his, and Officer Lyden's testimony that Adams admitted he had no permit.  At that point, the police had the right to seize the gun from the car, and, if they had not already done so, arrest Adams on possession of an unlicenced gun.

Therefore, Defendant's Motion to Suppress (document #19) is **DENIED.**

**SO ORDERED.**

**Date:  July 7, 2006**              **/s/NANCY GERTNER, U.S.D.J.**

---

³ Under ordinary circumstances, the plain view exception permits the warrantless seizure of an object provided that (1) the officer is lawfully positioned in a place from which the object can be plainly viewed; (2) the incriminating character of the object is immediately apparent; and, (3) the officer has a lawful right of access to the object itself.  Horton v. California, 496 U.S. 128, 136-37 (1990); United States v. Paradis, 351 F.3d 21, 31 (1st Cir. 2003).  In the instant case the officer was lawfully positioned, on the outside of the car. He had no right to go inside of it.  The gun was not immediately incriminating.  It could well have been lawfully possessed.